DECISION
Before this Court are various motions for summary judgment and for partial summary judgment pursuant to Super. R. Civ. P. Rule 56, brought by the Plaintiffs and the various Defendants in this action. Also before the Court is Cookson Group plc's motion to dismiss pursuant to Super. R. Civ. P. Rule 12(b)(2) for lack of personal jurisdiction.
 I Facts/Travel
Because the memoranda on the present motions are voluminous, the Court will introduce the salient facts rather briefly, and will set forth specific facts below where necessary. The two Plaintiffs are Asea Brown Boveri S.A. (ABB) and GTME De Venezuela S.A. (GTME). ABB and GTME are the remaining members of the Consortium Cuatricentenario Venezuela (Consortium), which entered into a March 25, 1997 contract with FOCAS, Inc. (FOCAS) to provide optical ground wire (OPGW) and *Page 2 
related services at a price of $7.5 million. (Ex. 8 to Pl's Mot. Partial Summ. J, Jul. 12, 2005. at 614-624.) (Purchase Order.)[1] In September 1997, revisions were made to the contract resulting in a new price of $7.3 million. (Ex. 17 to Pl's Mot.) The substance of those changes does not appear to be material to the issues in this case.
OPGW is a type of fiber-optic cable which transmits signals in the form of beams of light. The OPGW was installed on a series of towers spanning Lake Maracaibo in Venezuela. On or about September, 2000, the OPGW over Lake Maracaibo between towers 42B and 43B allegedly failed. The Plaintiffs are now suing each Defendant either directly, or under theories that include piercing the corporate veil and successor liability, for the alleged breach of a warranty clause in the contract.
The first Defendant is FI Projects, Inc., (FIP) which is the new name of FOCAS, the entity which contracted with the Plaintiffs.[2] FIP is a Delaware corporation with its principle place of business in Rhode Island. (First Am. Compl. ¶¶ 4, 6, 10; Ans. of FIP ¶¶ 4, 6, 10.) The Plaintiffs are also suing Alcoa Fujikura Ltd. (AFL), a joint venture organized in Delaware with a principal place of business in Tennessee. (First Am. Compl. ¶ 11; Ans. of AFL ¶ 11.) AFL purchased "certain assets and certain liabilities" of FIP on or about May 27, 2000. (First Am. Compl. ¶ 27; Ans. of AFL ¶ 27.) The Plaintiffs argue that AFL should be liable on the March 1997 contract under a theory of successor liability. Finally, the Plaintiffs are suing two entities in the corporate hierarchy *Page 3 
of FIP on a theory of piercing the corporate veil. The first is Cookson America, Inc. (Cookson America) a Delaware corporation with a principle place of business in Rhode Island. (First Am. Compl. ¶ 7; Ans. of Cookson America ¶ 7.) Cookson America is alleged to be the parent corporation of FIP. Finally, the Plaintiffs are suing Cookson Group plc (Cookson Group), which is alleged to be a United Kingdom corporation which directly or indirectly owns Cookson America and FIP. (First Am. Compl. ¶ 8-10.) If it becomes necessary later in this decision, the Court will explore the relationships among the various entities in greater detail.
The Court will first address the issue of whether the purchase order contract imposed a warranty obligation on FIP, so that it would now be liable for a breach of that obligation. The Plaintiffs and FIP contend that there is no genuine issue of material fact regarding liability, and that each is entitled to summary judgment on that issue. If the Court finds that there is no liability on the part of FIP, then there is no need to consider whether the other entities would also be liable on theories of successor liability or piercing the corporate veil. However, if the Court finds that FIP had contractual obligations which were not performed, or if there exists a genuine issue of fact which would require a trial on that issue, then the Court will consider whether Cookson America, Cookson Group, and AFL may be held liable for those contractual obligations, or if they are entitled to summary judgment. The Court will also address the Plaintiffs' claims for fraudulent transfer and tortious interference with contract.[3] *Page 4 
 II Standard of Review for Summary Judgment Motions
Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as [a] matter of law." Super. Ct. R. Civ. P. Rule 56(c). The Court "does not pass upon the weight or the credibility of the evidence," but instead it must consider the evidence "in a light most favorable to the party opposing the motion." Palmisciano v. Burrillville Racing Ass'n,603 A.2d 317, 320 (R.I. 1992). "If there are no material facts in dispute, the case is ripe for summary judgment." Richard v. Blue Cross BlueShield, 604 A.2d 1260, 1261 (R.I. 1992).
 III Breach of Contract and Warranty Claims
In support of its motion for partial summary judgment, the Plaintiffs enclosed a "Statement of Undisputed Material Facts" which, they claim, entitle them to summary judgment. Their claim revolves around a document entitled Especificacion — Specifications in English — which contains various technical requirements for OPGW, and which forms the basis for their breach of warranty claims. (Ex. 8 to Pl's Mot., at 633-639.) (Especificacion.)[4]
The portion of the Especificacion on which the Plaintiffs rely states:
 "3. Unit Containing the Optical Fibers: the unit containing the optical fibers will be a central element of aluminum, *Page 5 
continuous, with closed semi-tubular conduit to minimize the entrance of humidity and mechanical damages.
 Note: This is achieved by means of [FIP] Design developed specifically for the use of optical fibers in electrical cables, that have as exclusive characteristic a spatial helicoidally disposition of the fiber optic package[.]
 The physical disposition will efficiently protect the optical fibers from any physical or chemical damage, due to compression, humidity, or the presence of aggressive agents of the kind.
 The design will protect against the occurrence of damages to the fibers by transverse pressure or squashing. . ." (Especificacion ¶ 2.d.3 as translated in Ex. 8 to Pl's Mot.) (Emphasis added.)
The Plaintiffs argue that in September 2000, they discovered that the OPGW was failing to transmit signals. They contend that the OPGW failed due to corrosion caused by the atmospheric conditions over Lake Maracaibo. Finally, they contend that the failure of the various Defendants to replace the OPGW constituted a breach of warranty and breach of contract.
The Plaintiffs brought this action in March 2002. They have now moved for partial summary judgment on a variety of issues, essentially asking the Court to find FIP liable on the breach of warranty and contract claims, but deferring the question of damages for future proceedings. FIP objects to the motion on two grounds. First, it contends that the Especificacion was not a part of the writing which forms the agreement between the parties. Second, even if the Especificacion's terms are part of the contract, FIP contends that the Plaintiffs' claims are barred by the applicable statute of limitations.[5] *Page 6 
FIP has also raised various evidentiary objections to the facts upon which the Plaintiffs rely in their motion for partial summary judgment. The Court will first address the statute of limitations issue. Then, if necessary, the Court will address whether the terms in the Especificacion are part of the agreement and whether a breach of warranty or contract has occurred.
 A. Statute of Limitations
FIP argues that the Plaintiffs' claims are barred by the statute of limitations, contained in the Uniform Commercial Code (UCC), which applies to contracts for the sale of goods. See G.L. 1956 §6A-2-725(1).[6] The statute provides that "[a]n action for breach of any contract for sale must be commenced within four (4) years after the cause of action has accrued."[7] A cause of action accrues "when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." Section 2-725(2). Further, a breach of warranty typically occurs "when tender of delivery is made." Id. Therefore, in the typical breach of warranty case, a buyer has four years from delivery of goods to bring a claim for breach of warranty. FIP contends that since the last delivery of goods was made in December 1997, and this suit was brought in March 2002, the suit should be time-barred.
An exception to this general statute of limitations exists, however, where a warranty "explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance."Id. In such a case, the cause of action *Page 7 
accrues when the breach "is or should have been discovered."Id. It is undisputed that discovery of the alleged breach occurred on or about September 2000.[8] If this exception applies, the cause of action would not have accrued until the defect was discovered, and that date is well within four years of the date the Plaintiffs eventually filed suit in 2002. Therefore, whether or not the exception is time-barred depends upon the applicability of the "future performance" exception.
Section 2-725 of the UCC was designed "to serve the important function of providing a point of finality for businesses after which they could destroy their business records without the fear of a subsequent breach of contract for sale or breach of warranty suit arising to haunt them."Ontario Hydro v. Zallea Systems, Inc., 569 F. Supp. 1261, 1266 (D. Del. 1983) (internal quotations omitted). While this may occasionally result in hardship to an aggrieved party who does not discover defects within the four year limitations period, these "few odd situations . . . are thought to be outweighed by the commercial benefit derived by allowing the parties to destroy records with reasonable promptness."Id. The exception in § 2-725(2) exists, however, because when a seller explicitly guarantees performance of the goods into the future, the buyer should be able to benefit from this bargain despite the four-year statute of limitations. See id.
Although § 2-725 has a long history in the UCC, there appear to be no Rhode Island cases interpreting whether a warranty "explicitly extends to future performance." The cases from other jurisdictions appear inconsistent and were long ago described as being "in a hazy state." Michael Schmitt and Kenneth Hanko, For Whom the Bell Tolls — AnInterpretation of the UCC's Exception as to Accrual of a Cause of Actionfor Future Performance Warranties, 28 Ark. L. Rev. 311 (1974). That "haze" has not been *Page 8 
remedied by a revision to the statute or the emergence of a clear majority rule with respect to § 2-725. See Alice M. Wright, WhatConstitutes Warranty Explicitly Extending to "Future Performance" forPurposes of UCC § 2-725(2), 81 A.L.R.5th 483, 483 (2000) (Wright,Future Performance) (noting that "[c]ourts disagree whether express warranties promising to repair defects appearing in goods within a specified period of time or otherwise guaranteeing the performance of goods should be deemed to fall within the UCC § 2-725(2) exception").
In support of its statute of limitations argument, FIP contends that § 2-725 generally requires that a bargain make reference to a definite time period in order to find that a warranty extends to future performance. See, e.g., R.W. Murray Co. v. Shatterproof GlassCorp., 697 F.2d 818, 823 (8th Cir. 1983) (requiring that the "terms of the warranty must unambiguously indicate that the manufacturer is warranting the future performance of the goods for a specified period of time"). The Court agrees with this proposition of law.
FIP then argues, however, that because no such time period exists in the Especificacion, any warranty does not explicitly extend to future performance. This argument has no merit, however, in light of the following provision of the Purchase Order Contract:
 "8. Guarantee:
 The Supplier shall undertake remedy of any defect of the equipment, including the documentation, resulting from faulty desing [sic], material or workmanship included in the equipment or documentation which occurred before expiration of the guarantee period.
 . . . . *Page 9 
 The guarantee period is 60 months, after the date of final acceptance by the Purchaser's customer." (Purchase Order Contract 4.) (Emphasis added.)[9]
This provision clearly includes a time period and renders FIP's argument invalid. FIP would have this Court consider the two warranties separately, in isolation, to find that neither one is sufficient on its own to find liability. According to FIP, the Especificacion does not contain a time period, so it is inadequate. Similarly, while the guarantee clause contains a time period, it does not contain the language concerning protection from environmental elements, so it is also inadequate. However, warranties "shall be construed as consistent with each other and as cumulative" and only when such construction is unreasonable may the Court attempt to discern the intention of the parties as to which warranty shall dominate. See § 2-317.[10]
Here, the guarantee clause applies to defects in design, materials, and workmanship. The Plaintiffs claim that the Especificacion contains contract terms for design, materials, and workmanship to which the OPGW did not conform, and that the failure to replace the OPGW constitutes a breach of the warranty contained in the guarantee clause. Therefore, the guarantee clause is consistent with the Especificacion *Page 10 
and should be interpreted together with that document, if the Court determines that it constitutes a part of the agreement.
Determining whether or not FIP has in fact breached its obligations requires the Court to resolve the factual question of whether the Especificacion is part of the contract, and what actually caused the failure of the OPGW. It must then interpret the terms of the contract containing the warranty or warranties, and then determine whether a breach occurred. See § 2-317 (providing that certain types of warranties take precedence over other types of warranties when there is a conflict or an inconsistency). As the Plaintiffs seek partial summary judgment on these issues, the Court will address them below. However, the resolution of these issues does not affect the question of whether there is a warranty which extends to future performance.
The Court need only look to the language of the guarantee clause to answer this question. See Addison v. Emerson Elec. Co., 1997 U.S. Dist. LEXIS 3301 (D. Del. 1997) (noting that [t]he question of whether a warranty explicitly extends to future performance is essentially a matter of contract construction"). As the Court noted above, reference to a definite time period is necessary to find that a warranty extends to future performance. However, the existence of such a time period is not necessarily sufficient to invoke the future performance exception.
There is a significant line of cases finding that warranties to repair or replace defective goods do not extend to future performance of the goods in question. See Wright, Future Performance, 81 A.L.R.5th at 512-523 (collecting cases). For example, one Court found that the following warranty provision — which is similar in all material *Page 11 
respects to the guarantee clause in the case at bar — did not constitute a warranty of future performance:
 "If at any time up to twelve (12) months after the date of Acceptance of the Equipment by the Engineer, any defect or deficiency should appear due to faulty workmanship, material or design, or if the Equipment or any part thereof fails to meet the requirements of the Contract, the Company shall restore the Equipment to satisfactory operating condition by making good every such defect, deficiency or failure without cost to the Commission." Ontario Hydro v. Zallea Systems, Inc., 569 F. Supp. 1261, 1264 (D. Del. 1983) (emphasis added).
Like the guarantee clause in the case at bar, this provision provided that during a specific time period, the seller would remedy any defect in design, workmanship, or materials. Compare id. with Purchase Order 4. The Ontario Hydro court found that there was a difference between a warranty extending to future performance and merely a "repair or replacement warranty." 569 F. Supp. at 1266. The court reasoned that the latter does not warrant how a good will perform in the future, but "simply provides that if a product fails or becomes defective, the seller will replace or repair within a stated period." Id.
Other courts have rejected the distinction between a warranty to repair or replace, and a warranty extending to future performance. For example, in Krieger v. Nick Alexander Imports, Inc.,234 Cal. App. 3d 205, 217 (Cal.Ct.App. 1991), the Plaintiff argued that "it did not promise that its automobiles would perform satisfactorily during the warranty period" but instead "it only promised to repair any defects which occurred." The Court rejected this distinction and found that a "promise to repair defects that occur during a future period is the very definition of express warranty of future performance." *Page 12 Id.[11] See also Wright, Future Performance, 81 A.L.R.5th at 523-528 (collecting cases supporting this proposition).
This Court finds that the latter group of cases contains the better-reasoned rule, and that the Rhode Island Supreme Court would adopt their reasoning if presented with the issue. It simply makes no sense to say that a warranty to repair or replace defective goods within five years is not a warranty of future performance. Implicit in the rule of § 2-725(2), that a cause of action accrues upon tender of delivery, is an assumption that most defects are discoverable either by immediate inspection of the goods or within four years of tender of delivery. Therefore, most buyers will not be prejudiced by the limitations period. In the "few odd cases" where the four year limit does impose a hardship, that hardship is justified by the commercial benefit of being able to destroy records after a fixed period of time. See Ontario Hydro,569 F. Supp. at 1266.
However, by making a promise to repair or replace within a certain time period — in this case five years — the seller is acknowledging the possibility that a defect in the goods may remain latent for a period of time and agrees to bear that risk. No manufacturer can say with absolute certainty that their product will perform adequately in the future — all it can ever do is bear the cost of repair or replacement if it does fail. Therefore, to distinguish between a warranty of future performance and an agreement to repair or replace would render the latter type of clause virtually meaningless. Such a holding would deprive the Plaintiffs of the benefit of their bargain, which placed the *Page 13 
burden on the seller to supply a product free from defects for five years.[12] See also Purchase Order 4 (extending the guarantee period for five more years if a defective product is replaced). Moreover, as long as a certain time period is stated, such clauses provides the requisite explicitness required by § 2-725.
This Court's holding that the contractual warranty explicitly extends to future performance is consistent with the policies underlying the statute of limitations, which seek to provide certainty to commercial actors. The 60 month (five year) limit contained in the Purchase Order contract contains a definite time period within which a breach of warranty must occur. Any cause of action accruing during that period will then be barred after an additional four years under § 725(1).See Nationwide Ins. Co. v. General Motors Corp./Chevrolet MotorDiv., 533 Pa. 423, 434 (Pa. 1993) (noting that such a holding would "do no violence" to the policies underlying § 2-725 because sellers "will still be able to determine the time period for which they should maintain their records, simply by adding the limitation period to the warranty period"). A seller in the position of FIP should know with absolute certainty that the possibility of a suit under such a clause terminates, at the latest, nine years from acceptance of the goods by the Plaintiffs' customer.[13] Therefore, the Court finds that the Plaintiffs' claims are not barred by the statute of limitations in § 2-725. *Page 14 
 B. Incorporation of the Especificacion by Reference
There is no dispute that the parties entered into a binding agreement when representatives of FIP and the Plaintiffs executed the Purchase Order contract. FIP delivered the goods and the Plaintiffs have made payment. The dispute revolves around whether or not the Especificacion is incorporated into the writing and, therefore, whether its terms form a part of the agreement between the parties.
The primary writing is the Purchase Order contract, which was executed by representatives of FIP and the Plaintiffs on or about March 25, 1997. That agreement makes reference to seven numbered appendices on its cover page, including an Appendix 2 containing "Technical Specification and Quality Requirements." (Purchase Order at 614-615.) In addition, the agreement states that the appendices "have been read and understood by [FIP] and shall be deemed to form and read and construed as part of this Contract." Id. at 615; see also id. at 616 (stating that FIP "has full responsability [sic] that the equipment will comply with the Technical Specification" and referring to Appendix 2). The contract makes no direct reference to the Especificacion.
Rhode Island has recognized that "instruments referred to in a written contract may be regarded as incorporated by reference and thus may be considered in the construction of the contract." Stanley-Bostitch, Inc.v. Regenerative Envtl. Equip. Co., 786 A.2d 1063, 1065 (R.I. 2001);Rotelli v. Catanzaro, 686 A.2d 91 (R.I. 1996) (citing 17A Am. Jur. 2d Contracts § 400 (1991)). Both cases, however, involved two separate instruments which were both executed contemporaneously. Therefore, the Court did not have to set forth the requirements to find incorporation by reference where an executed instrument allegedly incorporates a separate unexecuted document. *Page 15 
Both the Plaintiffs and FIP have cited a well-recognized authority which states that "[s]o long as the contract makes clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt, the parties to a contract may incorporate contractual terms by reference to a separate, noncontemporaneous document, including . . . a separate document which is unsigned." 11 Samuel Williston Richard A. Lord, A Treatise on the Law ofContracts, § 30.25 at 235 (4th ed. 1999) (Williston,Contracts). In this case, to find that the Especificacion is incorporated into the writing, the Court must address two levels of incorporation by reference: whether the Especificacion is incorporated into Appendix 2, and whether that same Appendix 2 is incorporated into the Purchase Order contract. Therefore, it seems that so long as the writings describe the identity of the other document beyond doubt, then the document is incorporated and "becomes constructively part of the writing." Id. § 30.25 at 234.
Appendix 2 is essentially a two-page index that incorporates other publications of a technical nature. The Plaintiffs have provided their final copy of Appendix 2, a Spanish-language document, to the Court. (Ex. 8 to Pl's Mot. at 631 and enclosed translation.) That document refers to nine other documents, including the Especificacion, which is also written in the Spanish language. FIP has also provided two versions of Appendix 2 from their files, which appear to be similar in all material respects to the Plaintiffs' version and which include the Especificacion. (Exs. 8, 9 to FIP Statement of Facts.)
As an initial matter, it is clear to the Court that these three versions of Appendix 2 incorporate the Especificacion beyond all doubt.See Ex. 8 to Pl's Mot. at 631 (containing Appendix 2 which refers to "Proyecto de especificaciones . . . Rev. 4 97-02-15"); *Page 16 
Ex. 8 to FIP Statement of Facts at 16 (containing Appendix 2 and similarly referring to Especificacion); Ex. 9 to FIP Statement of Facts at 16 (same); see also Especificacion at 633 and enclosed translation (noting that the last revision occurred on 2/15/1997).[14] Therefore, the Court must consider whether these versions of Appendix 2, as a whole, were incorporated into the Purchase Order contract.
FIP seeks to avoid summary judgment by pointing to a factual dispute as to whether its representatives intended Appendix 2 and the Especificacion to be incorporated into the agreement. In a 2003 response to a request for admission, FIP stated that Mr. Jack Bottoms Jr., who was the President of FIP when the Purchase Order was executed,
 "transmitted to the [Plaintiffs' Consortium], through TRICAS, an executed copy of [the Purchase Order], and along with it, a copy of the Index of Appendix 2, and the draft [Especificacion.] Mr. Bottom's deliberate omission of his signature or initials on Appendix 2 and the draft [Especificacion] indicated his rejection of these as components of a contract." (FIP Admission #40 at 13, Ex. 9 to Pl's Mot.)[15]
In 2003, FIP appears to have taken the position that the failure to initial the pages of Appendix 2 and the Especificacion constituted a rejection of the non-initialed pages.
FIP now advances an irreconcilably inconsistent position on this issue.[16] Instead of contending that Appendix 2 was present but did not form part of the contract, FIP now *Page 17 
attempts to defeat summary judgment by denying that any part of Appendix 2 or the Especifcacion was even present when Mr. Bottoms executed the Purchase Order contract.[17] FIP presents the deposition testimony of Mr. Bottoms and an engineer for FIP, Mr. Eduardo Alaluf,[18] in support of this later position.
FIP argues that while the pages of the Purchase Order and Appendix 1 were initialed, indicating their presence at time of execution, Appendix 2 was not initialed. (Dep. of Jack Bottoms, Jr. 155:5-156:16, Mar. 30, 2005, Ex. 16 to Pl's Mot.) Therefore, it argues that the absence of initials demonstrates that Appendix 2 was not present. FIP also contends that its representatives never would have assented to the inclusion of the Especificacion because it was prepared by a representative of TRICAS, and because it had not been vetted by its engineering staff. (Alaluf Dep. 178:8-179:5, Mar. 23, 2005, Ex. 4 to FIP Statement of Facts.) At best, FIP argues that Appendix 2 and the Especificacion were only transmitted to FIP after execution. It is undisputed, however, that the index pages to Appendix 2 and the Especificacion were sent by the Consortium to FIP sometime in March 1997, though perhaps after the execution of the Purchase Order contract. (Resp. to Req. for Admissions #29, Ex. 9 to Pl's Mot.)[19]
The depositions upon which FIP relies do not necessarily support the assertion that Appendix 2 and the Especificacion were not present. Mr. Bottoms states that he received the Purchase Order and Appendix 1; he never states that he did not receive *Page 18 
Appendix 2. (Dep. of Jack Bottoms, Jr. 155:5-156:16, Mar. 30, 2005, Ex. 16 to Pl's Mot.) As to those pages, he stated that he did not recall if or when he received them. (Bottoms Dep. 163:3-5, Mar. 30, 2005, Ex. 2 to FIP Statement of Facts.) Nor does Mr. Alaluf recall when he received Appendix 2. He acknowledges only the possibility that the Especificacion was received after the contract was executed, but expresses his uncertainty as to exactly when it was received. (Alaluf Dep. at 145:9-16, Mar. 23, 2005, Ex. 4 to FIP Statement of Facts.) Only a generous interpretation of this testimony would lead to the conclusion that Appendix 2 was not present — at best the testimony indicates a failure of memory.[20]
However, assuming arguendo that the cited testimony is sufficient to create a genuine issue of fact, the Court finds that even if Appendix 2 and the Especificacion were absent at the execution of the Purchase Order, this is not a material fact which would defeat summary judgment. FIP relies on a statement in a treatise that "in order to uphold the validity of terms incorporated by reference, it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms." 11 Williston, Contracts § 30.25 at 234. FIP contends that if Appendix 2 was not present, then its representatives could not know of its terms, and, therefore, it was not a part of the contract.
The law is clear, however, that in the absence of extenuating circumstances which are not alleged here, such as fraud, duress, or mutual mistake, a party's failure to read or understand the terms of the contract is not a defense where the ignorant party has still *Page 19 
manifested his assent to the contract by signing the writing.[21]See Westerly Hosp. v. Higgins, 106 R.I. 155, 160, 256 A.2d 506, 509
(1969); see also 2 Williston, Contracts § 6.43 at 457-59. The party who fails to read the terms of the writing does so at its own risk. Because the Purchase Order was signed by its President, FIP must be charged with knowledge of its terms, and the contract clearly references Appendix 2. Even if the representatives of FIP did not read or possess Appendix 2 when the contract was signed, FIP was still bound by its terms.[22]
Therefore, even if the Court resolved this factual dispute in favor of FIP, this is not a material fact which would preclude summary judgment.
The only question that must be considered, then, is whether the identity of the referenced document may be ascertained without doubt.See 11 Williston, Contracts § 30:25 at 233. Phrased differently, if Mr. Bottoms had read the Purchase Order contract, what should he have understood the reference to "Appendix 2" to mean? There is some authority which suggests that the question of whether a document is identified beyond doubt is a factual issue inappropriately resolved at the summary judgment stage. See Chiacchia v. National WestminsterBank, 124 A.D.2d 626, 628 (N.Y.App.Div. 1986). The Court finds, however, that this factual issue has been developed to such an extent that only questions of law remain to be resolved. The Court finds that he should have *Page 20 
understood the reference to mean the version of Appendix 2 which, if not already received by FIP, was transmitted to FIP shortly thereafter.
Indeed, FIP does not even dispute that it possesses Appendix 2 and that it contains the Especificacion. It provided with its motion several versions of Appendix 2, obtained from various sources in its files, both of which include the Especificacion. (FIP Statement of Facts 25, 26 Exs. 8, 9.) There is no allegation that the reference to Appendix 2 in the Purchase Order contract means anything other than the complete copy of Appendix 2 which FIP possessed in its files and which includes the Especificacion.[23] Therefore, whether Appendix 2 was received after execution of the Purchase Order contract is irrelevant. If FIP did not intend to be bound by Appendix 2, which includes the Especificacion, then it should not have signed the Purchase Order contract which clearly referenced that document.
At the very least, FIP should have objected to the inclusion of the Especificacion in Appendix 2 when it received the bound version after execution of the Purchase Order. The Court will assumearguendo that the agreement that Mr. Bottoms thought he was executing included only the terms contained in the Purchase Order, Appendix 1, some earlier draft of Appendix 2, and perhaps the other appendices. Shortly thereafter, however, it is undisputed that the Consortium sent and FIP received a package which included Appendix 2 and the Especificacion.
Under § 2-207(2), if a party receives a written confirmation of a contract which states terms different or additional to those agreed upon, they are construed as proposals *Page 21 
for addition to the contract. Between merchants,[24] those terms become part of the contract unless:
 "(a) The offer expressly limits acceptance to the terms of the offer;
 (b) They materially alter it; or
 (c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received." Section 2-207(2).
Therefore, even if Mr. Bottoms intended to exclude Appendix 2, the receipt of the complete Appendix 2 containing the Especificacion must be construed as a proposal for additional terms which become part of the contract unless an exception applies. Paragraph (a) clearly does not apply. FIP has not alleged that the proposed terms "materially alter" the contract, so paragraph (b) does not apply. See 2 Williston,Contracts § 6:22 at 193, 195-96 (noting that "it is difficult to imagine a term which would materially alter a contract which is only additional, and not different" than the terms previously included, and that material alteration is usually a question of fact). Nor has FIP demonstrated that it gave notice of its objection to the inclusion of Appendix 2 and the Especificacion. See § 2-207(2)(c).[25] *Page 22 
The Court finds that these are issues upon which FIP had the burden to demonstrate an issue of fact in order to avoid summary judgment on this issue. See, e.g., DeSantis v. Prelle, 891 A.2d 873, 877 (R.I. 2006) (noting the well-settled rule that "the nonmoving party bears the burden of proving by competent evidence the existence of a disputed issue of material fact and cannot rest upon mere allegations or denials in the pleadings, mere conclusions or mere legal opinions") (internal quotations omitted). Because it has not met its burden, the Court must find that Appendix 2 and the Especificacion are part of the Purchase Order contract.
For these reasons, the Court finds that there is no genuine issue of fact that the Especificacion is incorporated in Appendix 2, and that Appendix 2 is incorporated into the agreement between the parties. Therefore, it will enter partial summary judgment on those issues.
 C. Existence and Cause of the Alleged Failure of the OPGW
Having concluded that the terms contained in the Especificacion are part of the agreement between FIP and the Plaintiffs, the Court will now examine whether the terms of the Especificacion were breached. The Plaintiffs ask the Court to find that a particular length of OPGW — between towers 42B and 43B — failed due to corrosion caused by atmospheric conditions. The Plaintiff further argues that this failure constitutes a defect in design, material, or workmanship. Therefore, it asks this Court to find that FIP and the other Defendants are liable for breach of contract and breach of warranty by refusing to replace the OPGW.
The Plaintiffs have set forth, in detail, various deposition testimony and affidavits which support the conclusion that the OPGW failed due to corrosion caused by the *Page 23 
atmospheric conditions of Lake Maracaibo. The Plaintiffs allege that employees of the Consortium were informed that the lighting system over the lake, which was controlled by the OPGW, failed. (Dep. of Jesus Roman 31:16-24, Apr. 28, 2005, Ex. 20 to Pl's Mot.) They then performed various tests on the cable.
The Consortium caused the cable to be removed from its towers, with the help of representatives from AFL, who had agreed to provide technical assistance with respect to the failed OPGW. (Dep. of Edward P. McCullough 41:11:15, 113:19:25, Jun. 14, 2005, Ex. 23 to Pl's Mot.) Tests were then performed on the cable by AFL, id. at 114:1-8, and by an independent testing laboratory called Fundatec. AFL concluded that corrosion was the cause of the OPGW failure. Id. at 30:5-7. The Fundatec report also states that "the accumulation of products of corrosion in the internal components of the OPGW cable are in part responsible for the squashing of the fiber optic cable." (Fundatec Technical Report. Ex. 26 to Pl's Mot. enclosed translation.) Therefore, the report recommended that the design of the cable be modified "to support the aggressiveness of the environment of Lake Maracaibo." Id.
FIP has attempted to avoid summary judgment on this issue by objecting to the foundation of the various evidentiary proffers made by the Plaintiffs. It objects to the admission of the various statements by AFL as hearsay and lacking in a foundation adequate to support the use of opinion testimony. FIP also objects to the Fundatec report because the Plaintiffs did not demonstrate an adequate foundation.
It is true that, on a summary judgment motion, the Court may only consider materials setting forth facts which would be admissible in evidence at trial. See Super. R. Civ. P. Rule 56(e). However, to the extent that the Plaintiffs' original motion contained *Page 24 
materials which were lacking in foundation, this appears to have been due to oversight. For example, the Plaintiffs reply included an affidavit of the person who prepared the Fundatec report and sets forth that he was adequately qualified to make that report. See,e.g., Aff. of Javier Garcia, June 8, 2006, Ex. A to Pl's Reply to FIP Statement of Facts. Therefore, the Court finds that the objection to the foundation of the Plaintiffs' materials is without merit.[26]
FIP also contends that expert testimony is never sufficient to support a summary judgment motion, relying on Crumley v. Memorial Hosp.,Inc. 509 F. Supp. 531, 533 (D. Tenn. 1978) (noting that, in general, expert testimony "is not an appropriate basis" for granting summary judgment "because the opinion of an expert witness is not conclusive and any weight and effect to be given such evidence, if admitted, is a function for the trier(s)-of-the-facts").
The Court finds that FIP's reliance on this case is misplaced. Even the Crumley court recognized that its statement was not an absolute rule. Id. Moreover, FIP has not submitted any contrary opinion evidence, or any evidence whatsoever, which would provide a basis to find that something other than corrosion caused the OPGW to fail. If the issue "is one of the kind on which expert testimony must be presented, and nothing is presented to challenge the affidavit of the expert, summary judgment may be proper." 10B Charles Alan Wright, et. al. § 2738 at 367-69 (1998). Therefore, the Court finds that it would be a misuse of judicial resources to conduct a trial on this issue in the face of the overwhelming and uncontradicted materials submitted by the Plaintiffs. *Page 25 
The Especificacion specifically states that the design, or "physical disposition," of the OPGW will "efficiently protect the optical fibers from any physical or chemical damage, due to compression, humidity, or the presence of aggressive agents of the kind. Thedesign will protect against the occurrence of damages to the fibers by transverse pressure or squashing. . ." (Especificacion ¶ 2.d.3 as translated in Ex. 8 to Pl's Mot.) (Emphasis added.) Therefore, if the cable did fail due to corrosion, one of the following is true: (1) the design was insufficient to protect the fibers of the OPGW from corrosion; (2) the materials used to make the OPGW did not adequately conform to the design; or (3) the workmanship did not conform to the design.
In any case, however, the failure triggers the guarantee clause. The failure occurred within the warranty period found in the guarantee clause of the Purchase Order contract, so FIP had an obligation to replace the failed OPGW. As FIP has denied having any liability to replace the OPGW, it is undisputed that it has not yet done so. This is a breach of the warranty found in the Purchase Order contract. Therefore, the Court will enter partial summary judgment finding that a breach of warranty and contract has occurred.
 D. Conclusion as to the Breach of Warranty Claim
Based upon the foregoing, the Court finds that the Purchase Order contract contains a warranty which explicitly extends to future performance, and therefore, the breach of warranty claim is not barred by the statute of limitations in § 2-725.
The Court finds that that no genuine issue of fact exists that the Purchase Order contract is valid and enforceable. The Court also finds that the terms contained in the Especificacion form part of the agreement which is represented by the Purchase Order *Page 26 
contract. The Court further finds that the OPGW failed due to corrosion caused by atmospheric conditions. Such failure constitutes a defect in the design, materials, or workmanship of the OPGW which occurred within the warranty period found in the guarantee clause of the Purchase Order contract. FIP has failed to replace the OPGW and therefore is liable for breach of warranty and breach of contract.
 IV Successor Liability
Having found that FIP is liable for some amount of damages, the Court must also consider whether that liability may be attributed to AFL. Therefore, the Court will consider the Plaintiffs' motion as it pertains to AFL, as well as the motion of AFL for summary judgment, which address whether AFL may be found liable on the Purchase Order contract on the basis of its May 2000 purchase of FIP's operating assets.[27]
The doctrine of successor liability involves balancing competing policy concerns which seek to respect the separateness of corporate entities, but also to protect corporate creditors. See 15A William Meade Fletcher et. al., Cyclopedia of the Law of Private Corporations § 7122 at 249 (perm. ed., rev. vol. 1999) (Fletcher, Corporations). The general rule is that a transferee ordinarily will not be held liable for the debts of the transferor corporation merely because an asset transfer has occurred. H.J. Baker Bro. v. Orgonics, Inc., 554 A.2d 196, 205 (R.I. 1989); 15A Fletcher, Corporations § 7122 at 218. *Page 27 
However, courts have recognized certain circumstances where the general rule should give way and liability should be attributed to the successor corporation. See, e.g., Ed Peters Jewelry Co. v. C J JewelryCo., 124 F.3d 252, 266 (1st Cir. 1997) (noting that successor liability is an equitable doctrine that exists "to safeguard disadvantaged creditors of a divesting corporation" because rigid adherence to the rule of separateness of corporations "can be bent to evade valid claims"); see also 15A Fletcher, Corporations, § 7122 at 252 (implying that many jurisdictions treat successor liability as a matter of equity).
Successor liability is generally divided into four theories: 1) when the transferor's debts are assumed by agreement, either express or implied; 2) when the facts or circumstances warrant a finding of de facto merger or consolidation between the companies; 3) when the asset sale amounts to a fraudulent transfer; and 4) when the purchasing company is a "mere continuation" of the selling company. 15A Fletcher,Corporations, § 7122 at 227-243. While treated as separate, the requirements and underlying policies of each theory significantly overlap with each other. The Plaintiffs have neither contended that the transaction constituted a de facto merger,[28] nor that it *Page 28 
constituted a fraudulent transfer.[29] Therefore, the Court will address whether an express assumption of liability occurred, and whether AFL is a "mere continuation" of FIP.
 A. Facts Pertinent to Successor Liability
The undisputed facts demonstrate that AFL purchased assets of FIP on or about June 1, 2000. On May 4, 2000, AFL and FIP executed an Asset Purchase Agreement. (Asset Purchase Agr., Ex. A to Aff. of Stuart Daniels, Ex. 1 to AFL Mem. Supp. Summ. J, July 7, 2005.) (APA.)[30]
The agreement provided for the transfer of the operating assets of FIP, including manufacturing facilities, machinery, research and development, intellectual properties, etc. (Daniels Aff. ¶ 14; APA ¶ 1.1 at 1-2.) The agreement also required AFL to "unconditionally offer employment" to "all" former employees of FIP who sought such continued employment and who were disclosed in the attached schedule. (APA ¶ 11.2 at 30.) In exchange for receiving the assets of FIP, AFL paid approximately $13.8 million. (APA ¶ 1.5 at 4.)
AFL also agreed to assume certain liabilities of FIP as described in the APA. Id. ¶¶ 1.3, 1.4 at 4. It agreed to assume any "obligations to perform under the Assumed Contracts." Id. ¶ 1.3(b). Those contracts include "all purchase orders for the sale of goods or the supply of services . . . which have not been fully performed on the Closing Date (those in existence on the date of this Agreement are listed on Seller's Disclosure Schedule to the extent required by Section 4.11 hereof)."Id. ¶ 1.1(f)(C).[31] Section 4.11 of the APA states detailed criteria which govern whether the obligations of a particular *Page 29 
contract are included in the "Seller's Disclosure Schedule." The Purchase Order contract at issue here was not included on that schedule. (Affidavit of Stephen J. Perrone ¶ 4, Jun. 9, 2006, Ex. A to AFL Reply Mem., Jun. 12, 2006.)
The only significant asset that FIP did not transfer to AFL was the right to payments arising from a telecommunications investment with an entity known as Electric Lightwave, Inc. (ELI). Id. ¶ 1.2(f) at 3. FIP had previously invested $46 million into the project with ELI. (Daniels Aff. ¶ 15.) Under the agreement with ELI, FIP was to receive one-third of revenues until FIP had received $46 million. Id. ¶ 20. Then FIP was to receive 12 percent of revenues thereafter. Id. The President of Cookson America states that the revenues from this project have yielded $7.7 million to date, and have declined since the project became operational. Id. ¶¶ 20, 21. In 2004, the ELI receipts totaled $848,000, and midway through 2005, had totaled $473,000. Id. ¶ 21.
AFL contends that at the time of the asset purchase in May/June 2000, it had no knowledge of the warranty claim which eventually formed the basis for this suit. (Aff. of Brian Herbst ¶ 2, Ex. 2 to AFL Mem. Supp. Summ. J., June 7, 2005.) AFL considered that project to be "a completed job for which [FIP] had received payment from its customer."Id. The Plaintiffs allege, however, that the defects in the cable arose as early as March 2000, so that AFL knew or should have known about the warranty claims.
 B. Express Assumption of Liability
The Plaintiffs rely on the language in the APA which states that FIP transferred to AFL "all purchase orders for the sale of goods . . . which have not been fully performed." (APA ¶ 1.1(f)(C), (G) at 2.) Plaintiffs argue that this language obligated AFL on the liabilities of any contracts which were unperformed as of the date of sale. *Page 30 
The Plaintiffs' argument has some persuasive force in light of the statute of limitations analysis. As the Court noted above, the guarantee clause of the Purchase Order contract obligated FIP to remedy defects uncovered within five years of acceptance of the OPGW's installation by the Consortium's customer, EDELCA. Performance under that contract includes not only providing the OPGW, but providing the warranty service imposed by that agreement. Until the limitations period expires, that obligation imposed at least a contingent liability on FIP which was unperformed as of May, 2000. Therefore, the warranty claim seems to fit within the language of the APA governing assumed contracts. Moreover, the Plaintiffs allege that the defects arose as early as March 2000, so that AFL knew or should have known about the defect giving rise to liability under the Purchase Order contract.
The Court finds, however, that the APA does not constitute an express assumption of the obligations under the Purchase Order contract. In spite of the general language assuming all contracts not performed, the APA's "Seller's Disclosure Statement" contains schedules which specifically set forth which liabilities were expressly assumed under the agreement. The Purchase Order contract at issue in this case is not among those listed. This express language must govern the more general language referring to all unperformed contracts, and, therefore, the Court finds that no express assumption occurred. See Restatement (Second) of Contracts § 203(c) (stating the general rule of contract interpretation that "specific terms and exact terms are given greater weight than general language."); 17A Am. Jur. 2d Contracts § 363 (1999) (stating similar rule); see also Chang v. University of R.I.,118 R.I. 631, 643, 375 A.2d 925, 931 (1977) (stating similar rule for interpreting statutes). *Page 31 
 C. Successor Liability as a "Mere Continuation"
The Plaintiffs contend that AFL should be found liable for the warranty obligation because AFL is a "mere continuation" of FIP. The Plaintiffs rely on the following facts to establish their claim: AFL's employment of former FIP employees, operation of the same cable manufacturing business in the same plant, and contracts between AFL and FIP to provide certain warranty repair services following the asset sale.[32]
Our Supreme Court recognized the vitality of this theory in H.J. Baker Bro. v. Orgonics, Inc., 554 A.2d 196, 204-05 (R.I. 1989). In that case, a jury had found that the defendant was not liable under a "mere continuation" theory, and the plaintiff sought a new trial. The Supreme Court found that the trial justice had inadequately stated the basis for denying the new trial motion, so it exercised "its right to make an independent determination." Id. at 205. The Court then reversed the trial justice and granted a new trial. Id. at 205.
The Court then noted five "persuasive" factors that courts examine to find a continuing entity:
 (1) there is a transfer of corporate assets;
 (2) there is less than adequate consideration;
 (3) the new company continues the business of the transferor;
 (4) both companies have at least one common officer or director who is instrumental in the transfer; and
 (5) the transfer renders the transferor incapable of paying its creditors because it is dissolved either in fact or by law." Id. at 205 (R.I. 1989). *Page 32 
The Supreme Court also noted other persuasive criteria, such as the common identity of officers, directors, and stockholders, and the continued use of the same office space. Id.
The Court relied on the following facts in support of its decision inOrgonics, Inc.: it found that a principal officer was common to the transferor and successor entities, and that management of the two entities was substantially the same. Id. It also found that the new entity had continued to use checks from the former entity; was covered under the same workers compensation plan as the former entity; operated the same manufacturing plant; retained many of the same employees; and sold the same product. The Plaintiffs now argue that the facts in this case are similar to the facts in Orgonics, Inc. so that the Court should find successor liability here.
Although the Supreme Court did not specifically refer to it in its "mere continuation" analysis, the Court clearly was also influenced by a particularly egregious scheme orchestrated by the past-president of the transferor corporation to shield assets from creditors which had recently sued the transferor corporation. See id. at 200. That scheme rendered the transferor corporation virtually insolvent, while the successor entity — of which that president became a principal — enjoyed the transferred assets without paying adequate consideration for them.Id. The Court finds that these facts are sufficient to distinguish theOrgonics, Inc. case.
First, although some employees of FIP became employees of AFL, it is undisputed that there are no common principals — officers, directors, or shareholders — between FIP and AFL.[33] Courts look to the existence of common principals between the *Page 33 
two entities in order to determine whether the purportedly separate entities are actually under control by the same person or persons. If so, a finder of fact could infer that the asset sale was merely a sham designed to defraud creditors. However, because there is no evidence of common principals between FIP and AFL, and therefore no control by common ownership, it is unlikely that the asset transfer was merely a scheme designed to defraud creditors.
More importantly, however, it is undisputed that AFL gave approximately $13.8 million, in cash and assumed liabilities, in consideration for the assets of FIP. The Plaintiffs have not even alleged, much less proved, that this payment was anything other than adequate consideration for the FIP assets. In response, the Plaintiffs have argued that it need not show all five of the Orgonics, Inc. factors in order to prevail on a mere continuation theory. The Court does not necessarily disagree with this statement. See Ed Peters JewelryCo., 124 F.3d at 269 (citing Orgonics, Inc. for the proposition that each claim for succesorship liability "requires a cumulative, case-by-case assessment of the evidence by the factfinder"). Moreover, questions such as the adequacy of consideration and whether a transferor is rendered insolvent will often be inappropriately resolved at the summary judgment stage. See id. However, in this case, the Plaintiffs' claim cannot be maintained without at least some showing that less than adequate consideration was paid by AFL.[34]
The mere continuation test "is not the continuation of the business operation but the continuation of the corporate entity." Travis v.Harris Corp., 565 F.2d 443, 447 (7th Cir. 1977). Here, the business of manufacturing cable continued, but it was operated by a *Page 34 
new ownership that apparently paid adequate consideration. There is nothing inequitable about merely transferring assets away from FIP, if FIP received reasonably equivalent value in return. Such a transfer would not render FIP any less capable of satisfying its obligations to creditors such as the Plaintiffs, so there would be no reason to disregard AFL's separate corporate existence. Under these circumstances, the Court finds that the Plaintiffs have failed to demonstrate facts sufficient to find AFL liable on a "mere continuation" theory of successor liability.
 C. Conclusion as to Successor Liability
For the reasons herein described, the Court will deny the Plaintiffs' motion for partial summary judgment against AFL, and will grant the motion for summary judgment in favor of AFL on the contract and successor liability claims.
 III Piercing the Corporate Veil: Liability of Parent Corporation for Obligations of Subsidiary
The Court will now consider the Plaintiffs' motion for partial summary judgment as it pertains to these two Defendants. It will also consider the motions of Cookson America and Cookson Group for summary judgment, as well as Cookson Group's 12(b)(2) motion to dismiss for lack of personal jurisdiction.[35] The Court will first describe the relationship between the various entities and the facts on which the Plaintiffs rely for their claims against these Defendants. The Court will then address the personal *Page 35 
jurisdiction issue. Finally, the Court will address whether either party is entitled to summary judgment, or whether a trial is necessary on these issues.
 A. Ownership Structure of Cookson Group, Cookson America, and FIP
There are approximately nine entities contained in the chain of ownership between FIP and Cookson Group. FIP is a wholly owned subsidiary of Cookson Investments, Inc. (CII), which in turn is a wholly owned subsidiary of Defendant Cookson America, a Rhode Island corporation.[36] (Aff. of Simon O'Hara ¶ 8, Jun. 20, 2005, Ex. E to Cookson America and Cookson Group Mot. Summ. J. Jul. 7, 2005.) Cookson America is itself a wholly owned subsidiary of Cookson North America Partnership (CNAP). Id. ¶ 5.
Defendant Cookson Group ultimately owns the entire interest in CNAP, though the chain of ownership between CNAP and Cookson Group is decidedly more complex. See id.. The stock of CNAP is owned by two entities: Cookson International Partnership (CIP) which holds 95.42% of the stock, and Cookson Investments, Ltd. (CIL), which holds the other 4.58%. Id. CIL is a wholly owned subsidiary of Cookson Group.Id.
CIP is owned by Wilkes-Lucas Ltd. (WLL), which owns 82.53% of CIP, and Cookson Ceramics (CC), which owns the other 17.47%. Id. CC is a wholly owned subsidiary of Cookson Group. Id. WLL is wholly owned by Cookson Overseas, which is a wholly owned subsidiary of Cookson Group.Id.
Through this set of related entities, Cookson Group can be considered a parent corporation of FIP. Cookson Group also owns many other subsidiaries which are not *Page 36 
otherwise related to FIP except through the common ownership of Cookson Group. See id. ¶ 3.
 B. Personal Jurisdiction over Cookson Group
Cookson Group's motion to dismiss is grounded on the assertion that it lacks the minimum contacts with Rhode Island necessary for the exercise of jurisdiction. In general, whether or not personal jurisdiction exists depends both on statutory and constitutional grounds. However, Rhode Island's "long-arm" statute provides that its courts have jurisdiction up to the limits of the Due Process Clause of the United States Constitution. G.L. 1956 § 9-5-33(a); Cerberus Partners, L.P. v. Gadsby Hannah, LLP, 836 A.2d 1113, 1118 (R.I. 2003). Therefore, personal jurisdiction depends only on the constitutional analysis, which in turn requires an analysis of whether a defendant has "certain minimum contacts" with Rhode Island "such that the maintenance of the suit does not offend `traditional notions of fair play and substantial justice."Id.
As described in Scully Signal Co. v. Joyal, questions of liability and jurisdiction are usually independent inquiries. See 881 F. Supp. 727,736 (D.R.I. 1995). However, "the factors considered for purposes of piercing the corporate veil in the liability context also inform the jurisdictional inquiry." Id. In the same way that the corporate form generally shields its shareholders from liability, those shareholders are also generally insulated from foreign jurisdiction in spite of their ownership of a foreign corporation. Id.; see Conn v. ITT Aetna Fin.Co., 105 R.I. 397, 406, 252 A.2d 184, 188 (1969) (finding that "complete ownership of a subsidiary which does business in the forum state will not alone without more subject the parent to the jurisdiction of the local courts"). *Page 37 
However, just as the corporate form may not be abused to shield a shareholder from liability, it also cannot serve to shield that shareholder from jurisdiction. See Scully Signal Co.,881 F. Supp. at 736 (finding the personal jurisdiction and veil-piercing inquiries to be the same when considering motions to dismiss under rules 12(b)(2) and 12(b)(6)); see also 1 Fletcher, Corporations § 43.70 at 326-27 (noting that there may be a lesser standard for veil-piercing merely for purposes of jurisdiction, and that a showing of control by the non-resident corporation over the resident corporation will suffice for jurisdictional purposes).[37]
The Court clearly has jurisdiction over Cookson America and FIP because their principle places of business are in Rhode Island. If the Court disregards the separateness of Cookson Group, Cookson America, and FIP, the Rhode Island contacts of FIP and Cookson America would then be attributed to the foreign Cookson Group, and the Court could exercise jurisdiction over it. Therefore, the Court will turn to its analysis of piercing the corporate veil.[38]
 C. Parent/Subsidiary Liability
The most basic feature of a corporation is that a shareholder is usually not liable for the obligations of its corporation. That rule holds true even where the lone shareholder is itself a corporation or other entity. As with successor liability, however, courts have disregarded the separateness of corporate entities when necessary to remedy certain inequitable conduct. See 1 Fletcher,Corporations § 48 (noting the similarity *Page 38 
between an alter-ego theory of piercing the corporate veil and successor liability). The Court will endeavor to evaluate the substance of the transactions at issue, and not merely elevate form over substance.See Bangor Punta Operations, Inc. v. Bangor A. R. Co., 417 U.S. 703,713 (U.S. 1974) (stating that "courts of equity, piercing all fictions and disguises, will deal with the substance of the action and not blindly adhere to the corporate form"). The Plaintiffs seek to disregard the separate corporate existence of FIP and Cookson America, so that FIP's obligations may be attributed to Cookson America. Similarly, the Plaintiffs also seek to attribute liability to Cookson Group.
If the material facts are undisputed, then summary judgment is appropriate. However, the resolution of veil-piercing issues often will be inappropriate for summary judgment, especially when fraud is alleged.See 1 Fletcher, Corporations, § 41.95 at 277. Our Supreme Court has also noted that "the criteria for piercing the corporate veil of limited liability var[ies] with the particular circumstances of each case."Doe v. Gelineau, 732 A.2d 43, 48 (R.I. 1999).
There are many factors which courts examine, but three types of factors usually drive the inquiry. 1 Fletcher, Corporations § 41.10 at 144-46. The first is a high degree of control by the parent over the subsidiary — the mere existence of a parent/subsidiary relationship is insufficient. When a parent-subsidiary relationship is involved, "it must be demonstrated that the parent dominated the finances, policies, and practices of the subsidiary" in order to impose liability on the parent. Gelineau, 732 A.2d at 48. There must also exist some degree of inequitable conduct which, under the facts of a particular case, "render it unjust and inequitable to consider the subject corporation a separate *Page 39 
entity." Id. at 48.[39] Finally, there must be a cause and effect relationship between the aforementioned control, the inequitable conduct, and the harm suffered by the Plaintiff. 1 Fletcher,Corporations, § 41.10 at 144-45. The burden rests upon the party, in this case the Plaintiffs, who ask the Court to disregard the separate corporate entity. See Gelineau, 732 A.2d at 49.
Cookson America and Cookson Group generally argue that they had no involvement in negotiating the Purchase Order at issue in this case, or with the day to day operations of FIP. Moreover, they argue that FIP was a viable corporation at the time of the contract, so that there would be no grounds for piercing the corporate veil. The Plaintiffs generally do not disagree that FIP was a viable, separate entity when they entered the Purchase Order contract. They take issue, however, with the manner in which the asset sale to AFL was conducted. They argue that Cookson Group and Cookson America dominated the decision to conduct the asset sale. As a result, FIP was allegedly transformed into nothing more than an inactive "shell" corporation, with few assets and business activities, and was incapable of meeting the warranty obligations of its contract.[40] On this basis, they seek to pierce the corporate veil.
 1. Unity of Control
Courts analyze the extent of control by a parent corporation over a subsidiary to determine if one is merely the alter ego of the other. The mere fact that a parent company *Page 40 
is the sole shareholder, as well as the mere existence of common officers or directors, is generally insufficient to impose liability. Rather, in the parent-subsidiary context, it must be shown that the parent "dominated" the affairs of the subsidiary. See, e.g.,Gelineau, 732 A.2d at 48. However, such common officers and directors may be evidence of such domination. Therefore, the Court will look to the evidence of overlapping directors and officers as evidence of control over the decision to conduct the asset sale.
It is undisputed that there are overlapping directors and shareholders between Cookson America and FIP, although the parties disagree on how to characterize the overlap. The undisputed evidence indicates that Stuart Daniels was the President of Cookson America from 1997 to 2002 — before and after the asset sale. (Daniels Aff. ¶ 1.) He was also a director and treasurer of FIP prior to the asset sale, and became president after the sale. (Letter of Ojeda to Hughes ¶ 6, Dec. 16, 2002, Ex. A to Pl's Obj. to Cookson Mot., Aug. 8, 2005.) Similarly, James Rosati was a Senior Vice President of Cookson America. Id. ¶ 6. He was also the chairman of FIP before and after the asset sale. Id. ¶ 7. Both participated in communications with AFL regarding the asset sale. Id. ¶¶ 6, 7.
In addition, Providencia Ortiz and John H. Doherty were both officers and/or directors of Cookson America who also served in similar positions for FIP before and after the asset sale. Id. ¶¶ 13, 14. There are also several other officers or directors of Cookson America who also served in positions with FIP either before or after the asset sale, but not both. Id. It is not known how many directors or officers of FIP were completely unaffiliated with Cookson America. However, at this stage, the Court finds *Page 41 
that this evidence is sufficient to give rise to an inference that Cookson America dominated the decision to conduct the asset sale.
There do not appear to be any officers or directors from Cookson Group who were also officers or directors of FIP during the time of the asset sale. Id. at 11, 12 (noting that any common officers or directors resigned in 1997). An employee of Cookson Group was involved in the negotiations with AFL. Id. at ¶ 6. The only other evidence of control by Cookson Group over FIP is that Jo Ellen Ojeda serves as an "associate general counsel" for Cookson Group in addition to serving as an officer and/or director for Cookson America and FIP. Id. ¶¶ 14 (noting Ms. Ojeda's roles with Cookson America and FIP; Exs. L, O to Pl's Obj. to Cookson Mot., Aug. 8, 2005 (indicating that Ms. Ojeda held herself out to represent Cookson Group). While the Plaintiffs allege that Cookson America is itself dominated by Cookson Group, from which domination over FIP could possibly be implied, they have provided little admissible evidence in the form of common directors and officers.[41] However, as described below, there may be evidence other than that of overlapping directors and officers which suggests domination by Cookson Group.
 2. Inequitable Conduct
If there is sufficient control, courts then examine whether that control involved such inequitable conduct as would justify piercing the corporate veil. See R B Elec. Co. v. Amco Constr. Co., 471 A.2d 1351,1354 (R.I. 1984) (finding that the veil should *Page 42 
be pierced only when it would be "unjust and inequitable to consider the subject corporation a separate entity").
Courts have pierced the corporate veil in the parent/subsidiary context when a dominant shareholder has siphoned assets from the corporation. 1 Fletcher, Corporations, § 41.30. The Court notes the clear policy of this state that, before a corporation may dissolve and terminate its legal existence, it must either pay or make adequate provision for the payment of all its debts and obligations.See, e.g., G.L. 1956 §§ 7-1.2-1303(6), 1308(b) (providing for voluntary dissolution only when adequate provision made for debts); § 614(a)(3) (prohibiting dividends which would render the corporation insolvent); § 811(d) (providing that directors held liable for an unlawful distribution have a cause of action for contribution against shareholders, proportionally). Some courts have also allowed creditors to obtain judgments directly against shareholders of a dissolved corporation, at least to the extent of property distributed, where that corporation has dissolved without adequately providing for the payment of its debts. 16A Fletcher, Corporations, § 8161 at 327. Therefore, although FIP has not been dissolved as a matter of law, if the Plaintiffs' allegations are supported by the evidence, a fact-finder could infer that the asset sale was structured to avoid the payment of FIP's warranty obligations, which would justify piercing the corporate veil.[42]
It is undisputed that FIP received a substantial amount of money from AFL as consideration for the asset sale. However, those proceeds were then transferred to some other entity in the corporate hierarchy — either Cookson America or Cookson Group. The Defendants contend that the proceeds of the asset sale were paid to Cookson America in *Page 43 
satisfaction of a legitimate, preexisting debt between Cookson America and FIP. (Daniels Aff. ¶ 17 (stating that the proceeds from the AFL sale "were applied against [FIP's] cumulative indebtedness carried on the books of [Cookson America]")). Even if true, such transactions must be considered with scrutiny because they can often serve as a means for siphoning assets. See 1 Fletcher, Corporations § 41.40 at 240 (suggesting that "the repayment of shareholder loans by itself does not constitute" impermissible siphoning, but that an "imbalance between loan and equity investments may point to siphoning").[43]
However, the record is sufficient to create an issue of fact as to whether the funds were even transferred to Cookson America, or instead to Cookson Group. Compare Letter of Ojeda to Hughes ¶ 8, May 22, 2003, Ex. U to Pl's Obj. to Cookson Mot., Aug. 8, 2005 (stating that the funds "were received by [FIP]" and that FIP "directed that the funds from the sale of assets of [FIP] to AFL be wired to Cookson Group");with Daniels Aff. ¶ 17 (quoted in previous paragraph). If the funds were transferred directly to Cookson Group, it would seriously undermine the Defendants' position that the funds were transferred in payment of a legitimate debt. On the contrary, it would support the conclusion that not only were assets siphoned, and FIP rendered incapable of meeting its obligations, but also that Cookson Group was the entity exercising dominant control over the asset sale transaction in order to obtain FIP's assets.
However, there are also certain facts which weigh against the Plaintiffs on the issue of inequitable conduct. The Defendants allege that the Plaintiffs' warranty claims *Page 44 
did not arise until after the AFL was complete. (Daniels Aff. ¶ 18.) The asset sale was consummated on or about June 1, 2000. However, the Plaintiffs do not allege that the cable failures at issue in this case occurred any earlier than September 2000, well after the asset sale had closed.[44] Therefore, it could not be said that the AFL transaction was merely a sham intended specifically to avoid paying the Plaintiffs. At best, a fact-finder could infer that the asset sale was intended to avoid paying warranty claims to the class of customers, of which the Plaintiffs are members, which had unexpired warranties on their purchase contracts. Clearly, though, FIP knew that it had contractual obligations to perform warranty services for a specified time after the asset sale, as it made some arrangements with AFL to provide some of those services. (Herbst Aff. ¶ 5.)
The Cookson defendants also claim that FIP remains a viable, separate entity because it still has an asset from the ELI venture.See, e.g., Letter of Ojeda to Hughes ¶ 10, May 22, 2003, Ex. U to Pl's Obj. to Cookson Mot., Aug. 8, 2005 (stating that FIP is not a "dormant" corporation and that it "is responsible to pay when due, all liabilities not assumed by AFL" which are primarily "product/project warranty claims" and that it still has an asset from the ELI venture). However, they also admit that revenues from that venture are declining and that it is unlikely that FIP will even recover the initial investment in that venture. (Daniels Aff. ¶¶ 20, 21.) While the record is silent as to the ultimate disposition of the approximately $7 million received by FIP from ELI to date, there is evidence that FIP believes it is incapable of paying for the Plaintiffs' claims. (Affidavit of Stephen E. Hughes, Esq. ¶ 5, Ex. G to Mem. Supp. Pl's Obj. to Cookson *Page 45 
Mot., Aug. 8, 2005.)[45] Moreover, the Defendants have not demonstrated that FIP continues to exist for any reason other than to receive the ELI funds and service warranty claims.
The Defendants also rely heavily on the fact that FIP and Cookson America continue to observe all necessary corporate formalities, such as keeping separate books and filing annual reports. Courts have often relied on the lack of corporate formalities in order to justify piercing the corporate veil, and it is undisputed here that the various entities have complied with these obligations. (Daniels Aff. ¶¶ 3, 4, 5, 7.) However, the Court will not elevate form over substance, and allow compliance with mere ministerial requirements to prevent the piercing of the corporate veil, if the Plaintiffs demonstrate that the corporate form has otherwise been abused. Therefore, while it is favorable to the Defendants that they are in compliance, such compliance alone is insufficient to grant summary judgment in their favor.
In conclusion, the Court finds that issues of material fact exist as to whether FIP's sole reliance on a declining source of funds was adequate to provide for anticipated future warranty obligations. If not, the fact-finder could conclude that Cookson America and/or Cookson Group utilized its alleged control of FIP to siphon the assets of FIP, in a manner intended to benefit only its parent corporations and inconsistent with FIP's remaining business purposes. If this conduct is shown to have effectively terminated the existence of FIP to the detriment of those who contracted for warranty services with FIP,[46] such facts could justify piercing the corporate veil. *Page 46 
 3. Causation of Harm to Plaintiffs
The Plaintiffs have demonstrated that they are entitled to the benefit of the warranty contained in their contract with FIP. They further have demonstrated evidence of inequitable conduct sufficient to avoid summary judgment at this time. If they are successful at trial in proving these claims, they will have suffered harm from the fact that FIP no longer has the capability to fulfill its contractual warranty obligation which the Plaintiffs have herein established.
 D. Conclusion as to Piercing the Corporate Veil
The Court finds that the evidence of control by Cookson Group over Cookson America and FIP is sufficient to make a prima facie case for exercising jurisdiction over Cookson Group and, therefore, the Court will deny its motion to dismiss pursuant to Rule 12(b)(2).
The Court also finds that material issues of fact remain as to piercing the corporate veil. Therefore, the Court will deny the Plaintiffs' motion for partial summary judgment on this ground, and will also deny the motion for summary judgment in favor of Cookson America and Cookson Group on Count X of the First Amended Complaint.
 V Fraudulent Transfer
Count VIII of the First Amended Complaint alleges that the transfer of the asset sale proceeds from FIP to either Cookson America or Cookson Group constituted a *Page 47 
fraudulent transfer.[47] Cookson America and Cookson Group have moved for summary judgment on this claim. The UFTA provides several means for a creditor to demonstrate the existence of a fraudulent transfer. The Plaintiffs rely upon § 6-16-4, which applies to both present and future creditors; and § 6-16-5, which applies only to present creditors of the debtor.
As described above, the Plaintiffs may be able to demonstrate at trial that the transfer of the sale proceeds, to either Cookson America or Cookson Group, was such that FIP became incapable of providing the warranty services to which it had obligated itself under the name FIP. Moreover, the Plaintiffs could prove that FIP intended the transaction to have that effect, or reasonably should have expected it to have that effect. See § 6-16-4(a)(2)(ii) (providing that a transfer made without receiving reasonably equivalent value may be fraudulent if the debtor reasonably should have expected to incur debts beyond the ability to pay).
If the Plaintiffs prove these allegations to the fact-finder, they could also satisfy § 6-16-4(a)(1), which defines a fraudulent transfer as any transfer made with "actual intent to hinder, delay, or defraudany creditor of the debtor." See § 6-16-4(a), (b) (emphasis added). Such "actual" intent may be proved inferentially through other circumstances which include the non-exclusive "badges of fraud" contained in §6-16-4(b). Several of those indicators may be present here. For example, the transfer to either Cookson Group or Cookson America was to an insider of FIP. Section 6-16-4(b)(1). The transfer of the sale proceeds could be considered as "substantially all" of FIP's remaining assets.See id. § 4(b)(5). Moreover, depending on how one characterizes the loan by Cookson America which allegedly was paid with the proceeds, the transfer may *Page 48 
have been without reasonably equivalent value and could constitute a removal of assets from the debtor. See id. § 4(b)(7), (8).
In summary, there remain factual issues which preclude summary judgment on this claim, and the Court will deny the Defendants' motion. Therefore the Court will defer its consideration of whether § 6-16-5, which pertains only to present creditors, may also have applicability here.
 VI Tortious Interference with Contractual Relations
Count IX of the First Amended Complaint alleges that AFL, Cookson America, and Cookson Group have tortiously interfered with the contractual relationships between the Plaintiffs and FIP, and between the Plaintiffs and its customer, EDELCA.[48] These three Defendants each seek summary judgment on this claim.
The "basic elements" of such a claim are "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his intentional interference;[49] and (4) damages resulting therefrom."Jolicoeur Furniture Co. v. Baldelli, 653 A.2d 740, 752 (R.I. 1995);see also Restatement (Second) of Torts §§ 766 (stating that "[o]ne who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability. . ."); id. § 767 (stating factors which make interference improper). *Page 49 
If the Plaintiffs are successful at demonstrating all of these elements, they will have made a prima facie case, and the burden then shifts to the Defendants to demonstrate an adequate justification for any interference. UST Corp. v. General Rd. Trucking Corp., 783 A.2d 931,937 (R.I. 2001).[50]
Since only the Defendants are seeking summary judgment at this time, the Court will first examine whether there is at least a genuine issue of fact with respect to each of the four basic elements. Then, if necessary, the Court will examine the Defendants' arguments that they each had sufficient justification for their actions as a matter of law.
 A. AFL's Liability for Tortious Interference
The Court will first consider AFL's actions. As described above, AFL conducted an asset purchase, assumed no liability for the obligations under the Purchase Order, and the Plaintiffs do not contend that the consideration received was inadequate. The Court assumesarguendo that the Plaintiffs have established AFL's knowledge of the Purchase Order contract, that AFL intentionally failed to replace the OPGW, that the failure interfered with the Plaintiffs' contract with EDELCA, and that harm has resulted to the Plaintiffs. Even so, the Plaintiffs have not established that AFL had any contractual duty *Page 50 
to replace the cable. That AFL had no duty to replace the OPGW constitutes an adequate justification, as a matter of law, for its decision not to do so.
 B. Liability of Cookson America and Cookson Group for Tortious Interference
Cookson Group and Cookson America argue that they are entitled to summary judgment because the Plaintiffs cannot demonstrate any of the four basic elements of their claims. Such rhetoric is exaggerated, as it cannot reasonably be disputed that the Plaintiffs had contracts with FIP and with EDELCA, respectively. The substance of their argument focuses upon the following issues: 1) knowledge of the contracts, 2) intent to cause the interference, and 3) justification.
 1. Contract Between Consortium and EDELCA
The Plaintiffs first allege that Cookson America and Cookson Group tortiously interfered with the Plaintiffs' contract with EDELCA. However, they do not allege that any affirmative act constituted the interference — rather, they allege that the failure to perform FIP's warranty obligations constituted the interference. However, unless the Court disregards the separateness of the various corporate entities, Cookson America and Cookson Group would have no obligation to perform FIP's contract and failure to do so would be completely justified. Therefore, this claim can only prevail if the Court pierces the corporate veil of FIP.
If the veil is pierced, the failure to perform the warranty obligations could constitute an interference with the EDELCA contract.See Restatement (Second) of Torts § 766, com. h (noting that an interference may occur when "when performance by B of his contract with C necessarily depends upon the prior performance by A of his contract *Page 51 
with B and A fails to perform in order to disable B from performing for C.")[51] The Plaintiffs could then attribute FIP's undisputed knowledge of the EDELCA contract to Cookson America and Cookson Group. Finally, the Plaintiffs could demonstrate that FIP, Cookson America, and/or Cookson Group knew that "interference [was] certain or substantially certain to occur as a result" of their non-performance of the warranty obligations, which would fulfill the intent requirement.See id. § 766 com. j.
Therefore, the only remaining question would be whether the failure to perform its warranty obligations interference was justified or improper. As the Court has found that such obligations existed and were breached, it follows that the Plaintiffs have met their prima facie burden to show lack of justification. Therefore, the burden shifts to the Defendants to demonstrate that their failure was justified. The Court finds that at this stage, that burden has not been met and that a genuine issue of fact remains as to justification. Therefore, it would be improper to grant summary judgment in favor of the Defendants on this issue.See Restatement (Second) of Torts § 767 com. l. (stating that "determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question").
 2. Contract Between Consortium and FIP
Next, the Plaintiffs claim that Cookson America and Cookson Group tortiously interfered with the Plaintiffs' Purchase Order contract with FIP by causing the proceeds *Page 52 
of the asset sale to be removed from FIP.[52] The Court will again address the knowledge, intent, and justification elements.
The knowledge requirement is satisfied if each Defendant had "knowledge of the contract with which [it] is interfering and of the fact that [it] is interfering with the performance of the contract." Restatement (Second) of Torts § 766. Knowledge is required because a person cannot intentionally interfere with contract of which it has no knowledge. See id. § 766 com. i. However, the Plaintiffs need not show that each Defendant knew of the contract's specific terms. Rather, they need only show that a Defendant "had knowledge of facts which, if followed by reasonably inquiry, would have led to complete disclosure of the contractual relations and rights of the parties." 45 Am. Jur. 2dInterference § 9 (1999).
It is undisputed that Stuart Daniels and James Rosati were officers and/or directors of Cookson America, and were involved in the negotiations with AFL. (Letter of Ojeda to Hughes ¶ 6, Dec. 16, 2002, Ex. A to Pl's Obj. to Cookson Mot., Aug. 8, 2005.) Moreover, an employee of Cookson Group was also involved with negotiations. Id. As evidenced by the APA, the contractual liabilities of FIP were the subject of those negotiations. Therefore, the Court finds sufficient evidence, for purposes of summary judgment, to put Cookson America and Cookson Group on notice that the Purchase Order contract existed. *Page 53 
If it is shown that either Cookson America or Cookson Group removed a large portion of assets from FIP after the asset sale, such facts could constitute an intentional interference with the Purchase Order contract.See Restatement (Second) of Torts § 766, com. h. (suggesting that interference occurs when performance is rendered impossible by the acts of the defendant). Moreover, a fact-finder could find intent if it is shown that Cookson America or Cookson Group knew that the removal of FIP's assets was substantially certain to render FIP incapable of performing its contractual obligations. See id. com. i.
Such an intentional interference, if found by the fact-finder, would certainly be unjustified as it contravenes the laws of this state which seek to prevent distributions from corporations when the corporation would become insolvent and incapable of meeting its obligations.
 3. Conclusion as to Tortious Interference
The Court finds that if the Plaintiffs are successful at piercing the corporate veil of FIP, then they may also prevail on their tortious interference claims with respect to the EDELCA contract. Whether or not they are not successful at piercing the corporate veil, they may still prevail on their tortious interference claims with respect to the Purchase Order contract. Therefore, the Court must deny the motions of Cookson America and Cookson Group for summary judgment on the tortious interference claims. The Court will, however, grant summary judgment in favor of AFL on the tortious interference claim. *Page 54 
 Conclusion
After due consideration of the arguments advanced by counsel at oral argument and in their memoranda, the Court will grant the Plaintiffs' motion for partial summary judgment, as described herein, on the contractual liability issues.
The Court will grant AFL's motion for summary judgment on successor liability.
The Court will deny the Plaintiffs' motion for partial summary judgment with respect to piercing the corporate veil and imposing liability on Cookson America and Cookson Group. However, the Court will also deny the motion for summary judgment brought by Cookson America and Cookson Group on the claims for piercing the corporate veil. The Court will deny Cookson Group's motion to dismiss pursuant to Super. R. Civ. P. Rule 12(b)(2) for lack of personal jurisdiction.
The Court will grant AFL's motion for summary judgment on the claims for tortious interference with contractual relations. The Court will deny the motions for summary judgment by Cookson America and Cookson Group on the tortious interference claims and fraudulent transfer claims.
Counsel may present an order consistent herewith which shall be settled after due notice to counsel of record.
[1] References to the Purchase Order contract are to the version in Exhibit 8 to the Plaintiffs' Motion, unless otherwise specified. There is no dispute that this agreement is binding on FIP. (FIP Resp. to Pl's "Statement of Undisputed Material Facts" ¶ 9-30 at 21, May 22, 2006.) (FIP Statement of Facts.) However, FIP only admits to the applicability of the Purchase Order contract and Appendix 1, which are found at Exhibit 8 to Pl's Mot. at 614-630. Id.
[2] It is undisputed that FOCAS and FIP are the same legal entity. (First Am. Compl. ¶ 1; Ans of FOCAS and FIP ¶ 56.) FOCAS was renamed FIP because when FOCAS sold its assets to AFL in May 2000, one of the assets sold was the FOCAS brand name. (Bottoms Dep. 32:14:20, March 30, 2006, Ex. 3 to AFL Mem. Supp. Summ. J., Jul. 7, 2005.) To avoid confusion, the Court will refer to this entity as FIP for the rest of this decision, even if the discussion involves events occurring prior to the name change.
[3] The parties have all focused on Rhode Island law in their memoranda, and no party appears to have plead the applicability of any foreign law. See Super. R. Civ. P. Rule 44.1 (requiring parties to give reasonable notice of the applicability of foreign law if they intend to raise an issue of foreign law). Therefore, the Court will apply Rhode Island law to all aspects of the motions before the Court even though the contract in this case refers to Swedish law. (Purchase Order Contract 9.)
[4] FIP has objected to this Court's consideration of the translations included with Plaintiffs' Motion because they lacked an affidavit authenticating the translations. FIP has not raised any question as to the accuracy of the translation, however, and the Plaintiffs provided such an affidavit in their reply. (Ex. F to Reply of Pls to Resp. of FIP to Statement of Undisputed Material Facts, Jun. 9, 2006.) Therefore, the Court will consider the accuracy of the translations as undisputed facts in this motion.
[5] Although FIP has not formally moved for summary judgment, it stated in its reply memoranda that it seeks judgment in its favor on the statute of limitations issue. Therefore, the Court will treat its statute of limitations argument as a cross-motion for summary judgment.See Thomas v. Ross, 477 A.2d 950, 953(R.I. 1984) (finding it is proper to enter judgment in favor of a non-moving party, even in the absence of a cross-motion for summary judgment, if the requirements for summary judgment are met).
[6] No party has disputed that UCC Article 2 applies to this transaction. Further references to the Rhode Island UCC in this decision will include only the title and section number, i.e. § 2-725.
[7] The parties may reduce the limitations period, but they may not extend it. Section 2-725(1).
[8] See, e.g., Albornoz Dep. 35:12-15, Ex. 21 to Pl's Mot.
[9] The Court will refer to this provision as the "guarantee clause."
[10] Express warranties are created by the seller through either affirmations of fact or promises relating to the goods, descriptions of the goods to be produced, and/or use of samples or models. Section 2-313. If the warranties are inconsistent, the Court must apply the following rules to determine which warranty is dominant:
 "(a) Exact or technical specifications displace an inconsistent sample or model or general language of description.
 (b) A sample from an existing bulk displaces inconsistent general language of description.
 (c) Express warranties displace inconsistent implied warranties other than an implied warranty of fitness for a particular purpose." Section 2-317.
[11] Although the Krieger Court relied upon a statutory definition of warranty that differs from that found in Rhode Island's § 2-313, this Court finds that the reasoning of that case applies to any reasonable definition of warranty.
[12] Some Courts have found that similar warranty clauses were not warranties of future performance, but were merely limitations of available remedies for a breach of warranty. See R.W. Murray Co. v.Shatterproof Glass Corp., 697 F.2d 818, 823 (8th Cir. 1983) (reversing a lower court which so found). Under § 2-316(4), the parties may limit the available remedies for a breach of warranty. However, the guarantee clause specifically states that the remedies provided in the clause are "without prejudice to any other rights which the Purchaser may have" with respect to the warranty. (Purchase Order Contract 4.) Therefore, even if that might be a proper construction in some cases, it would not make sense in this case.
[13] Rhode Island law also provides an absolute ten-year statute of repose, after which no suit is possible, which begins running from the date goods are sold. Section 2-725(5).
[14] It is of note that the Purchase Order contracts contained in these exhibits and the index pages to Appendix 2 are continuously paginated, indicating that they are part of the same instrument.
[15] TRICAS was an intermediary between the Plaintiffs and FIP with respect to this contract. The Plaintiffs contend that TRICAS was an agent of FIP, while FIP disputes this claim and argues that TRICAS was only an "independent sales representative."
[16] The Court is extremely concerned with permitting FIP to take such an inconsistent position at this stage in litigation. See D H TherapyAssocs. v. Murray, 821 A.2d 691, 693-94 (R.I. 2003) (noting that the doctrine of judicial estoppel is a discretionary doctrine designed to promote truthfulness and fair dealing by prohibiting a party from taking inconsistent positions on the same issue in judicial proceedings). However, because of the manner in which the Court disposes of the merits of this issue, it need not address the applicability of this doctrine.
[17] FIP argues that "the Especificacion was not part of the document that the Consortium submitted to [FIP] for execution as the purchase order contract, and only was compiled into the bound, appendices-included version of the purchase order after the fact." (Mem. of FIP in Resp. to Pl's Mot. 4, May 22, 2006.)
[18] See Aff. of Eduardo Alaluf ¶ 3 Aug. 11, 2005, Ex. 2 to FIP Mem. Opp. Pl's Mot., May 22, 2006. (stating his role as an engineer involved with the OPGW purchase).
[19] The Plaintiffs dispute this fact and assert that Appendix 2 was present in March 1997 when FIP signed the Purchase Order contract.
[20] Another equally plausible interpretation is that the inability of Mr. Bottoms to recall whether Appendix 2 was present at execution of the Purchase Order represents abandonment of the theory that the "deliberate omission of his signature or initials on Appendix 2 and the draft [Especificacion]" were effective to indicate his rejection of these contractual components. See FIP Admission #40 at 13, Sep. 16, 2003, Ex. 9 to Pl's Mot.
[21] This rule makes sense because the other party to the contract — the Plaintiffs in this case — are relying upon the outward manifestations of acceptance of the contract. Therefore, even if FIP was subjectively ignorant of the contract terms, it must be bound if it objectively manifested its assent to the contract's terms.
[22] FIP's reliance upon Drans v. Providence College is misplaced.See 119 R.I. 845, 853, 383 A.2d 1033, 1037 (1978) ("a person is not bound by the terms of a written agreement if he had no knowledge of its terms because the manner in which they are embodied in the instrument would not lead a reasonable person to suspect that the terms are part of the contract.") In that case, the court found that the "standard forms used by the college did not expressly incorporate the provisions of the Faculty Manual." Id. In this case, however, the references to Appendix 2 in the Purchase Order contract, and to the Especificacion in Appendix 2, could not be more express.
[23] FIP has noted the existence of certain earlier drafts of Appendix 2 from January 1997 which do not include the Especificacion. However, at no point does it contend that the reference in the Purchase Order means anything other than the versions of Appendix 2 which do contain the Especificacion.
[24] The UCC defines merchant as "a person who . . . by his or her occupation holds him or herself out as having knowledge or skill peculiar to the practices . . . involved in the transaction or to whom such knowledge or skill may be attributed by his or her employment of an agent or broker or other intermediary who by his or her occupation holds him or herself out as having such knowledge or skill." Section 2-104(1).
"For purposes of [§ 2-207] almost every person in business would, therefore, be deemed to be a `merchant' [under the language quoted above] since the practices involved in the transaction are non-specialized business practices such as answering mail. In this type of provision, banks or even universities, for example, well may be `merchants.'" Section 2-207, Off. Com. 2; see Deweldon, Ltd. v.McKean, 125 F.3d 24, 27 (1st Cir. 1997) (referring to this definition of "merchant" as "expansive"); Providence W. R. Co. v. Sargent Greenleaf, Inc., 802 F. Supp. 680, 685 n. 2 (D.R.I. 1992) (same).
[25] FIP admits that it gave no oral indication of a rejection of the additional terms. (FIP Admission #41, Ex. 9 to Pl's Mot.)
[26] The Plaintiffs also allege that AFL is the agent of FIP and therefore its statements are admissible against FIP. The Court need not address the agency issue because the Court finds that the Fundatec report, related affidavits, and supporting affidavits are sufficient, in the absence of any evidence to the contrary, to establish that the failure of the cable was caused by corrosion.
[27] AFL also has not raised any separate issues with respect to contract formation, the terms of the Purchase Order, or the failure of the OPGW. To the extent that it has adopted the arguments presented by FIP, the above discussion applies to AFL as well. Therefore, discussion of AFL's liability will focus on issues of fact and law concerning successor liability.
[28] The requirements to find a de facto merger are set forth inRichmond Ready-Mix ex rel. Accounts Receivable of Atl. Ready-Mix
Concrete v. Atl. Concrete Forms, Inc., 2004 R.I. Super. LEXIS 82, 29-30 (R.I.Super.Ct. 2004). (requiring
 "1. that there was a continuation of the enterprise of the selling corporation vis a vis
a continuation of management, personnel, physical location, assets, and general business operation;
 2. that there is a continuity of shareholders resulting from the purchase of the assets with shares of stock, rather than cash;
 3. that the selling corporation ceases operations, liquidate[s], or dissolves as soon as possible; and
 4. that the purchasing corporation assumes the obligations of the selling corporation necessary for uninterrupted continuation of business") (citations omitted).
[29] Criteria for finding a fraudulent transfer are set forth in the Uniform Fraudulent Transfer Act, G.L. 1956 §§ 6-16-1 to 6-16-12
(UFTA).
[30] The Daniels Affidavit also appears at Ex. C. to Cookson America and Cookson Group's Motion for Summary Judgment, July 7, 2005.
[31] The agreement also includes a "catch-all" clause which covers "all other contracts . . . which have not been fully performed" so long as they are listed on the attached disclosure schedule. (APA ¶ 1.1(f)(G) at 2.)
[32] It is undisputed that AFL contracted with FIP to provide warranty service to prior FIP customers. (Herbst Aff. ¶ 5.) However, the Plaintiffs have only provided an unauthenticated, unexecuted draft version of that document at Ex. 3 to their Reply to AFL's Motion for Summary Judgment. Therefore, the terms of the agreement must be considered unknown for purposes of this motion.
[33] The President of FIP before the asset sale, Jack Bottoms Jr., was retained as a "consultant" for eight months following the sale. (Bottoms Dep. 32:21-33:14, Mar. 30, 2006, Ex. 3 to AFL Mem. Supp. Mot. Summ. J., Jul. 7, 2005.) However, his testimony indicates that this position was in name only, and that it involved no actual responsibilities for AFL.See id.
[34] For the same reason, a claim of successor liability under a fraudulent transfer theory would probably also fail, had the Plaintiffs alleged that theory. Whether a transferor received "reasonably equivalent value" for transferred assets is a key element of a fraudulent transfer inquiry. See G.L. 1956 § 6-16-4(a)(2).
[35] These Defendants have not alleged any arguments with respect to the contract formation, terms of the Purchase Order, or the failure of the OPGW. To the extent that they have adopted the arguments presented by FIP, the above discussion applies to these two Defendants as well. Therefore, the Court's consideration of their liability will focus on issues of fact and law which relate to whether FIP's liability may be attributed to Cookson America or Cookson Group.
[36] This sentence reflects the ownership of FIP as of 1997. In 1999, Cookson Finance, Inc. (CFI) acquired 1% of the stock of CII. (Daniels Aff. ¶ 2.) CFI is owned by Cookson America. Id.
[37] It appears undisputed that if the Plaintiffs cannot pierce the corporate veils of FIP and Cookson America, then there are no other contacts between Cookson Group and Rhode Island which would support the exercise of jurisdiction.
[38] As the Court is considering motions for summary judgment, the Court will determine whether the Plaintiffs have set forth facts establishing a prima facie case for jurisdiction. See Scully SignalCo., 881 F. Supp. at 735 (citing Boit v. Gar-Tec Products, Inc.,967 F.2d 671 (1st Cir. 1992)).
[39] In a parent/subsidiary relationship, courts consider "whether the debtor corporation is merely an alter ego of the nondebtor corporation, and the siphoning of funds of the corporation by the dominant shareholder. A combination of these factors with an element of injustice, fraud, or fundamental unfairness is usually a sufficient basis for piercing the corporate veil." 1 Fletcher,Corporations, § 41.30 at 186.
[40] For example, the Plaintiffs have submitted an affidavit from an investigator indicating that the principal place of business of FIP is the same Providence building as Cookson America's principle place of business, and that there is no physical indication that FIP exists as a separate business. (Aff. of Timothy Fitzgerald, Ex. L to Mem. Supp. Pl's Obj. to Cookson Mot. Summ. J., Aug. 8, 2005.)
[41] The Plaintiffs have provided a spreadsheet in their brief which purports to illustrate additional overlapping officers and directors. (Pl's Mem. Opp. Cookson Mot. Summ. J. 3, Aug. 8, 2005.) However, the sources for these assertions are inadequately cited and therefore the Court does not rely upon them.
[42] Although the Defendants contend that no creditors of FIP remained unpaid, clearly the Plaintiffs are at least one unpaid creditor, even though their claim may not have arisen until after the asset sale.
[43] In their memoranda, Cookson America and Cookson Group state that "the [Cookson America] investment in the acquisition of the assets that were utilized by [FIP] was accounted for as a loan." (Cookson America and Cookson Group Mot. for Summ. J. 5, Jul. 7, 2005.) This suggests the possibility of undercapitalization, which is one factor used by courts to determine whether to pierce the corporate veil.
[44] The Plaintiffs allege, and it appears undisputed, that FIP did replace a spool of OPGW, which allegedly failed due to corrosion, after it was discovered in March 2000 by the Consortium. (First Am. Compl. ¶ 24, 25.) However, the Plaintiffs have not argued that the March 2000 failure had anything to do with the failures discovered in September 2000 which are at issue here.
[45] Mr. Hughes is the Plaintiffs' counsel and submitted an affidavit that Ms. Ojeda stated that FIP is incapable of paying claims in the magnitude requested by the Plaintiffs.
[46] Although a competent version of the agreement is not before the Court, it appears that FIP did make some provision for its warranty services by contracting with AFL to provide services to its former customers following the asset sale. (Herbst Aff. ¶ 5, Jul. 1, 2005, Ex. 2 to AFL Mot. Summ. J., Jul. 7, 2005.) The terms of this agreement would be instructive in ascertaining whether adequate provision was made for FIP's contractual obligations.
[47] The Plaintiffs have not alleged that the transfer of assets to AFL constitutes a fraudulent transfer.
[48] As to this latter contract, the Plaintiffs claims also apply to FIP. FIP has not sought summary judgment on the tortious interference claim. However, as described below, the Court's consideration of the claims against Cookson America and Cookson Group necessarily has implications for FIP as well.
[49] Courts generally do not recognize a claim for negligent interference with contractual relations. Restatement (Second) of Torts § 766C (1979).
[50] There exists a split of authority on whether it is the Defendants' sole burden to allege and prove justification, or rather, whether the Plaintiffs must first make some prima facie showing that the alleged interference lacks justification. Restatement (Second) of Torts § 767, com. b. (noting that justification "is generally treated as a matter of defense, but not always in the tort of interference with contractual relations."); id. § 767, com. k.
In Rhode Island, our Supreme Court has recently indicated that the burden rests upon the Plaintiff to make a prima facie showing of lack of justification before the burden shifts to the Defendants. BelliveauBldg. Corp. v. O'Coin, 763 A.2d 622, 627 (R.I. 2000) (finding that to establish a prima facie case of intentional interference with contract, "aggrieved parties must allege and prove not only that the putative tortfeasors intended to do harm to the contract but that they did so without the benefit of any legally recognized privilege or other justification"). But see Smith Dev. Corp. v. Bilow Enters.,112 R.I. 203, 211 (R.I. 1973) (stating that "[t]he burden of proving sufficient justification for interference is upon the defendant").
[51] Interference need not lead to a breach of the contract, but rather, need only consist of any act which "retards, makes more difficult, or prevents performance, or makes performance less valuable."New England Multi-Unit Hous. Laundry Ass'n v. Rhode Island Hous. Mortgage Fin. Corp., 893 F. Supp. 1180, 1192 (D.R.I. 1995).
[52] At the outset, the Court notes that the Plaintiffs' claims are somewhat inconsistent. They first seek to disregard the separateness of FIP, Cookson America, and Cookson Group. If the Plaintiffs prevail on those issues, then, Cookson America and/or Cookson Group will essentially be treated as parties to the contract and be liable for its breach. On the other hand, a tortious interference claim presumes that the Defendants are separate from the parties to the contract.See, e.g., Rao v. Rao, 718 F.2d 219, 225 (7th Cir. 1983) (finding that "a party to a contract cannot be held liable for tortiously inducing himself to breach the contract. . . . Only a third party separate from the contracting parties can be liable for such a tort") (citations omitted). However, under the circumstances of this case, the Court does not see any bar to asserting both a tortious interference claim and a claim for piercing the corporate veil. *Page 1